**Jim PARKS, d/b/a Jim's Painting and Decorating Company, Appellant,**

v.

**The GLIDDEN COMPANY, Appellee.**

**No. 7899.**

Court of Civil Appeals of Texas.

Texarkana.

Oct. 15, 1968.

Rehearing Denied Nov. 12, 1968.

Clair F. Achenback, Dallas, for appellant.

Franklin Spafford, Richard S. Geiger, Spafford, Freedman, Hamlin, Gay & Whitham, Dallas, for appellee.

CHADICK, Chief Justice.

Public Housing Project No. TEX 27–4 in the City of McKinney, Texas, let a general contract to Empire Construction Company of Dallas for construction of 70 dwelling units in accordance with the terms and specifications annexed to the contract. Empire Construction Company in turn let a subcontract to Jim Parks, d/b/a Jim's Painting and Decorating Company, to do the paint work required under the contract, the requirement being generally to apply paint to the housing units and furnish labor and materials for that purpose.

On the theory that the Glidden Company not only breached a paint sale contract with him, but also breached an express warranty and an implied warranty to furnish suitable paint for the contract, Jim Parks sued the Glidden Company to recover losses and damages directly and indirectly occasioned by the alleged breaches.

A jury was empaneled in the trial court. When introduction of testimony on behalf of Parks was completed, his counsel moved for an instructed verdict. Counsel for the Glidden Company made a motion for a similar ruling in its behalf. The trial judge directed the jury to elect a foreman and to return a verdict in favor of the Glidden Company and against Jim Parks, and in compliance the jury returned a verdict as directed. Judgment that plaintiff Jim Parks take nothing by his action and pay all costs was entered.

After study of the appeal record, the briefs of counsel and the authorities cited, the conclusion is reached that the Glidden Company's motion for directed verdict should not have been granted. There is evidence in the record tending to show that sales representatives of the Glidden Company had reason to know the particular purpose for which the paint Parks purchased from the company was required; and that Parks relied upon the skill and judgment of the Glidden Company's representatives to select and furnish suitable paint. The evidence in this respect was not tendered in an orderly and cohesive array, but sufficient evidentiary facts are entangled in the mass to raise a jury issue. Sales resulted from oral negotiations and are not the subject of a wholly written agreement. Besides oral testimony, a printed label from a paint can, Glidden Company sales slips or invoices, and the contractual specifications are in the record.

Jim Parks testified that after he entered into the paint subcontract he called Mr. Jimmy D. Bates, a sales representative with the Glidden Company, and talked on the telephone with him an hour and a half. The next day Mr. Bates met with Parks and talked more. The conversations occurred before interior painting was begun in the housing units. The witness said that in the conversations Mr. Bates "assured me that Glidden Spread Satin was the material for the job". Within a short time, perhaps the same or the next day, Mr. Eddie Bender, Bates' superior in the company, was called into the discussion. The witness said, "I talked with him for about an hour or an hour and fifteen minutes on the phone on a Saturday evening, and read the specifications to him and met him an hour later in a cafe near my office." There Bender looked at the paint specifications, according to Parks. The several conversations were in mid-December, 1966.

Interior painting of the units actually began about the 20th of March, 1967. Parks related that after a few units were painted difficulty was encountered in turning out

acceptable paint work. A condition referred to in the industry as "photographing", or "shadowing" plagued the painters; the paint failed to produce a visibly uniform cover over variegated surfaces and materials in the interior of the units. Mr. Bates and Mr. Bender were called in for consultation and direction. Mr. Parks testified, "We applied this material pretty much the way the reading on this label, the first time. Then under direction of Mr. Bates and Mr. Eddie Bender and the gentleman sitting at the table over there, we put this material on under their recommendations, under their thinning—well, we put it every way that it could be put on, with them watching, even with their regulated gun pressure, and we still could not get a job that did not photograph through".

Representatives of the Glidden Company suggested and furnished additive compounds in an effort to secure acceptable paint characteristics and performance. Effort to find a solution to the paint problem continued. Glidden furnishing paint and Parks paying, or agreeing to pay for it, until all but sixteen units were painted out. Paint of a different manufacture was used on the last sixteen. There is other proof of like import with that here mentioned, as well as evidence tending to establish other elements of the action, but the above appears adequate to demonstrate that the evidence raised a factual issue for jury determination.

Implied warranty, the fitness of goods for a particular purpose, has had recent legislative consideration. On the subject, the Uniform Commercial Code—Sales, § 2.315. says:

"Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose, (59th. Legis. Ch. 721, Sec. 2–315.) Acts 1967, 60th Leg. vol. 2, p. 2343, ch. 785 § 1."

Although it may factually be argued that when negotiations were initiated with the Glidden Company's sales agents, that these company representatives did not know the particular purpose for which the paint was required; yet, after examining the plans and specifications, they knew, or should have known, the nature of the surfaces proposed to be painted, and the particular use and purpose of the paint required. Even more to the point, as the painting progressed they became acquainted with the problems encountered and the unsatisfactory nature of the paint's performance. With this admitted knowledge, the company representatives continued to supply paint, along with suggestions as to how it might be made to give a satisfactory result. The company's representatives, if this evidence be true, were necessarily aware of the particular purpose or use required of the paint as distinguished from ordinary use. Particular purpose envisages a specific use by the buyer which is peculiar to the nature of his business; in this instance, the purpose of the paint was to give a visibly uniform cover over interior walls and ceilings constructed of several different materials. On the other hand, the ordinary purposes for which the paint might be used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question. See comment under the cited section in Vernon's Texas Codes, Anno.—Business and Commerce, p. 218 (1968); 1 Anderson's Uniform Commercial Code, pp. 212–214, (1961).

As indicated, the conclusion is reached that the case must be reversed and remanded, but it is thought that a discussion of the merit of the appellant's other theories of recovery would be of little benefit, as the case has not been fully developed and it cannot be anticipated what additional pleadings might be filed, or proof made. Accordingly, the judgment will be reversed and the cause remanded to the trial court.