James E. ALM, Appellant,

v.

ALUMINUM COMPANY OF AMERICA, et al., Appellees.

No. C14–82–00045–CV.

Court of Appeals of Texas, Houston (14th Dist.).

June 23, 1988.

Rehearing Denied June 23, 1988.

W. Douglas Matthews, Timothy F. Lee, Schmidt & Matthews, Houston, for appellant.

Michael Connelly, Robert Roach, Houston, for appellees.

Before JUNELL, MURPHY and SEARS, JJ.

## OPINION ON MOTION FOR REHEARING

MURPHY, Justice.

On motion for rehearing we withdraw our Opinion dated April 28, 1988, and substitute the following.

This case is before us on remand from the Supreme Court of Texas. *Alm v. Aluminum Co. of America*, 717 S.W.2d 588 (Tex.1986), on appeal from our original opinion at 687 S.W.2d 374 (Tex.App.1985). The mandate calls for us to consider:

1) Alcoa's factual insufficiency points regarding the adequacy of its warning of the hazard of cap blow off to Alm and/or JFW;

2) Alcoa's factual insufficiency points regarding its failure to include a mechanical inspection system and its designing the cap with a pilfer-proof band by weighing all of the evidence; and

3) any points Alcoa may choose to raise in respect to the jury's finding of gross negligence and exemplary damages.

In our original opinion, we held Alcoa owed a duty to give an adequate warning to the bottler, J.F.W., about the risk that an improperly applied cap could blow off and cause personal injury. 687 S.W.2d at 381. Furthermore, we mistakenly reasoned that Alcoa had made such adequate warning to J.F.W. 717 S.W.2d at 592. We further held Alcoa's duty to give an adequate warning, however, did not extend to the ultimate consumer. *Alm*, 687 S.W.2d at 382. On Motion for Rehearing in our court, Alm vigorously asserted that Alcoa's duty to warn extended not to J.F.W., the bottler, but to 7–Up, the parent soft drink corporation because 7–Up has control over the beverage labels. 687 S.W.2d at 383. Now, the supreme court has held Alcoa had a duty to warn Alm, the ultimate user of the product, but could satisfy its duty by proving that its intermediary, J.F.W., was adequately trained and warned, familiar with the propensities of the product, and capable of passing on a warning. 717 S.W.2d at 592. Thus, the supreme court has fashioned a new rule. *See Leonard v. Aluminum Company of America*, 800 F.2d 523 (5th Cir.1986), and *Costilla v. Aluminum Company of America*, 826 F.2d 1444 (5th Cir.1987).

The salient issue when applying this new rule is whether Alcoa, as the original designer/manufacturer of the capping machine, had a reasonable assurance that its warning would reach those who might be endangered by the use of its product. 717 S.W.2d at 591. This means that if the warning to the intermediary was inadequate or misleading, or Alcoa's reliance on

its intermediary was unreasonable due to incapacity, then Alcoa remains liable for injuries sustained by the ultimate user.

■ In the trial court the issue of negligence was broadly submitted, resulting in the jury's failure to make an explicit finding on the adequacy of Alcoa's warning. However, the jury did find that Alcoa and J.F.W. proximately caused the occurrence resulting in Alm's injuries. From this, the supreme court reasoned that out of the four allegations Alm pleaded and attempted to prove concerning Alcoa's negligent conduct, the jury must have found at least one as true in order to find Alcoa's negligence proximately caused Alm's injuries. Accordingly, one of Alm's allegations was that Alcoa's warning to J.F.W. was inadequate. After reviewing the evidence, the supreme court concluded there was some evidence that Alcoa inadequately warned its intermediary and that this court must decide if the evidence was insufficient to support the verdict or if the verdict was so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate*, 150 Tex. 663, 666, 244 S.W.2d 660 (1951).

It is undisputed that Alm's injuries were the result of a bottle cap blow-off caused by the improper threading of an aluminum cap which had been applied to a bottle of Seven Up. The closure system utilized on the particular bottle which caused Alm's injuries had been designed and manufactured by Alcoa. J.F.W., the bottler, had purchased that closure system from Alcoa and used it for servicing Seven Up, the parent soft drink company.

Alcoa provided an Owner's Manual with its capping machine, which was dated 1970 and provided the statement: "[l]eakage or closure blow-off at lower pressures can occur when closure application is improper...." This appears from the evidence to be the only "warning" Alcoa gave J.F.W. concerning the hazards associated with bottle cap blow off until 1977 when Alcoa issued a manual containing a more explicit statement, reading: "On occasion, an improperly applied closure can be violently ejected by pressure in a package. This can cause serious injury to handlers or consumers." However, through a study conducted by one of Alcoa's employees as early as 1970, and as a result of an increasing number of lawsuits arising out of injuries associated with bottle cap blow-offs beginning in 1967, Alcoa had reason to believe that blow-offs of misapplied bottle caps could cause serious injury to the consumer many years prior to Alm's injury which occurred on June 3, 1976.

Alcoa asserts that specific measures were taken for training and instructing J.F. W. personnel by Alcoa's technical service representatives on various occasions from 1970 through 1976. However, as pointed out in the supreme court's opinion at 717 S.W.2d at 593, no proof was offered at trial showing that J.F.W. ever received any of the information allegedly made available to them in the form of instructions on bottle cap blow-off, slide presentations showing the hazards of it and wall charts distinguishing proper from improper cap application. Moreover, Mr. Charles Ferro, plant superintendent for J.F.W. since mid 1975, testified that, in fact, he was unfamiliar with the hazards of bottle cap blow off and he had seen neither the slide presentation nor the poster that Alcoa alleged it distributed to J.F.W.

Here, Alcoa argues that Ferro's assertion of not only Alcoa's failure to warn him, but also of his unfamiliarity with the hazards of misapplied caps, is not believable. Mr. Ferro testified to having been involved in the bottling business for thirty-one years. He stated that he has worked for Royal Crown and Gulf Coast Bottling Company of Houston and San Antonio Bottling, all connected with carbonated beverages. Consequently, Ferro was aware that J.F.W. was packaging a product with carbonation and pressure in it, and that packages filled with a carbonated beverage can explode on line during the processing system. However, we fail to see why, if Ferro, as J.F.W.'s plant superintendent, had a practical background with bottling and packaging carbonated beverages, this should relieve or discharge Alcoa's duty to warn. Alcoa was responsible for designing

and manufacturing the capping machine and was familiar enough from prior incidents of cap blow-offs to commission a study completed in 1970 with the express intent of establishing "what factors of closure design, composition and application, taken separately, are most influential in the blow-off performance of the cap."

By the mandate directed to this court, we are charged to consider Alcoa's insufficiency points regarding the adequacy of its warning to J.F.W. It appears from the record that the only "warning" Alcoa gave J.F.W. was the statement contained in the manual earlier referred to. It is clear from a reading of the statement that no mention is made of the serious nature of personal injuries which can result from a bottle cap blow off. It is significant that leakage and closure blow-off are presented together in the statement suggesting that closure blow off need not be regarded as more serious than leakage; whereas, as has already been developed, closure blow-off can cause serious injury and leakage can cause a flat soft drink. Moreover, it is probably arguable that the statement could have served as directions in the manual, as opposed to constituting a warning. Yet, the distinction between the statement serving as a warning or as directions is important, as many courts have held that each serves separate purposes. *Bituminous Casualty Corp. v. Black and Decker Mfg. Co.*, 518 S.W.2d 868, 873 (Tex.Civ.App.—Dallas 1974, writ ref'd n.r.e.). Ultimately, it appears that the wording is such that its distinct purpose is not readily apparent. However, it is clear that Alcoa had a *duty* to present a clear cautionary statement setting forth the exact nature of the danger involved. *Id.* at 873. Consequently, it was not against the great weight and preponderance of the evidence for the jury to find that the statement included in the owner's manual distributed by Alcoa did not adequately warn J.F.W. concerning the hazard of bottle cap blow-off.

Since we have found the evidence that Alcoa failed to adequately warn J.F.W. sufficient to support the jury verdict, we do not find it necessary to reconsider Alcoa's other factual insufficiency points. Those points concerning Alm's allegations of negligence based on Alcoa's failure to include an automatic inspection system and Alcoa's negligent design of the pilfer-proof ring, are now considered for their bearing on the previously disregarded issues of gross negligence and exemplary damages.

We consider that the mandate of the Supreme Court precludes this court from considering Seven–Up as an appropriate intermediary in regard to ordinary negligence. The mandate, however, contains no such restriction concerning the issue of gross negligence. Specifically, the mandate calls for this court to consider any point Alcoa may choose to raise in respect to the jury's finding of gross negligence and exemplary damages. Alcoa has raised both legal and factual sufficiency grounds. Although the Supreme Court reinstated the jury's issues on gross negligence following the trial court's error in disregarding them, we do not consider the Supreme Court has passed upon the legal sufficiency of those issues by their reinstatement. Accordingly, we now address the legal sufficiency of the evidence regarding gross negligence.

■ In determining whether there is some evidence to support the jury's finding of gross negligence, the reviewing court must look at all of the surrounding facts, circumstances, and conditions, not just individual elements or facts, which tend to show a state of mind amounting to conscious indifference. *Burk Royalty Co. v. Walls*, 616 S.W.2d 911 (Tex.1981). Furthermore, we are mindful we must consider all evidence in a light most favorable to the jury verdict and we must indulge every reasonable inference deducible from the evidence in favor of the verdict. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965).

Initially, we begin by examining the evidence favorable to the jury's findings of gross negligence as it applies to Alcoa's failure to warn. The evidence here was that Alcoa had actual knowledge about the hazards of "weak threads" being produced by bottlers using the Alcoa closure system as early as 1967, when the first suit was filed against Alcoa for a personal injury

which had resulted therefrom. Mr. Jaye D. Gibbs, who testified at trial as an expert for Alcoa, wrote a report in 1970, in his capacity as an Alcoa employee, that contained the findings of a study he had conducted on the Alcoa closure system. This study found that "[f]aulty performance can cause serious injury to a would-be consumer if the closure blows off...." Gibbs testified he considered the weak threads to be the most serious problem with the closure system back in 1970. Moreover, Mr. George Overturf, Manager of Closure Technology, testified Alcoa has always known that if a cap is improperly applied it can blow off and injure someone.

Overturf also demonstrated a lack of genuine concern over the steadily rising number of lawsuits filed against Alcoa. Whereas, in 1967 one lawsuit was filed, resulting in a frequency rate of .77 lawsuits per billion closures produced, by 1975 thirty four suits had been filed, with a frequency rate of 6.54 lawsuits per billion closures produced. The number of claims for the eight year period totaled at least 127. Furthermore, Overturn affirmed his awareness of a report entitled "Hazard Analysis: Bottles for Carbonated Soft Drinks—April 1975" from the U.S. Consumer Product Safety Commission that indicated the second largest number of complaints from consumers related to carbonated soft drinks for the period extending from November, 1970, to December, 1974, was the propulsion of bottle caps, most often being the aluminum type of caps at issue here. Yet Overturf gave a negative response to the inquiry of whether the bottle cap blow-off problem was serious. When pressed, Overturf took the position that the number of injuries would have to be greater than 127 between 1967 and 1975 for the problem to be considered serious.

Given the apparent state of Alcoa's knowledge concerning bottle cap blow-offs, it was understandable that Alcoa prepared wall charts showing pictures of improperly applied caps and a slide show presentation detailing the problem and potentially dangerous results occurring from bottle-cap blow offs. As already noted in the Supreme Court's opinion, however, J.F.W. did

not receive a wall chart until well after Alm was injured and apparently, none of the employees of the J.F.W. bottling plant ever saw the slide show presentation. Further, we have already passed upon the "warning" which Alcoa asserts it included in the 1970 Owner's Manual that went with the capping machine, and, in any event, J.F.W. employee, Ferro, testified he never saw the manual until shortly before trial. Also J.F.W. evidently never received the 1970 Gibb's report (earlier referred to), and evidence at trial demonstrated that Mr. Richard Condra, an Alcoa technical service representative, was not even aware of the problem with blow-offs before trial. The technical service representatives were responsible for calling on bottlers and servicing their capping machines, designed by Alcoa. Mr. Stephen Matisko, superintendent of capping machine technology service and the national supervisor of all technical service representatives for Alcoa since 1974, testified there was no indication from the technical representative services reports that "any specific document, letter, piece of paper, slide show, movie, video film, anything that indicates that Seven–Up Bottling Company, Houston Seven–Up, as it is called, or J.F.W., was ever advised about the specific hazard of an eye injury from these blow-offs prior to June 3, 1976." Finally, evidence of a letter was produced which indicated that Matisko instructed a technical service representative, who had made a service call on J.F.W. six months before Alm's injury, to advise J.F.W. of the need for periodic checking of the head sets on the capping machines and the hazards that can result from misapplication. Matisko requested this letter be sent because of a report the technical service representative had sent Alcoa. Although he instructed a copy be sent to him, Matisko admitted on cross-examination he possessed no records to indicate the letter he requested to be sent warning J.F.W. of the hazard of misapplication was ever written.

During the trial Alcoa took the position it was utilizing efforts directed towards bottlers to get them to turn out properly threaded caps to the consuming public. Al-

coa did not, and quite apparently could not, take the position it was unaware of injuries occurring as a result of bottle cap blow-offs. While the record is replete with evidence clearly showing Alcoa was aware of the situation, the record is virtually silent concerning Alcoa's efforts to warn and instruct J.F.W. The means demonstrated by Alcoa as techniques to alert the bottlers who used the Alcoa patented capping machine, about the hazards of misapplied caps, were evidently never shared with J.F.W. Alcoa's awareness that J.F.W. remained uninformed of the problem was demonstrated by the non-production at trial of memos or documentation, normally kept by Alcoa as evidence something had been done to instruct the bottlers. The combination of Alcoa's awareness of the hazards associated with misapplication, and their apparent lack of any effort to inform and, or, educate J.F.W. before the date of Alm's injury, constitutes some evidence before the jury of an entire want of care indicating Alcoa's conscious indifference. We hold the evidence was legally sufficient to sustain the jury's finding of gross negligence.

We now address the factual sufficiency of the evidence and thus consider and weigh all the evidence, both in support of and contrary to the challenged finding. In so passing, this court is mindful of *Herbert v. Herbert*, 754 S.W.2d 141 (1988); *Pool v. Ford Motor Co.*, 715 S.W.2d 629 (Tex.1986), and is aware we must uphold the jury's finding unless we find the evidence is so weak or the finding is so against the great weight and preponderance of the evidence as to be manifestly erroneous or unjust.

We incorporate our legal sufficiency analysis into this discussion of the factual sufficiency of the evidence and consider Alcoa's argument against their alleged failure to invent a fail-safe mechanical inspection system. Alcoa put on the testimony of their expert, Dr. Block, who testified, as did Overturf, that the closure was designed so that any misapplication which would be significant enough to result in a premature release would result in a repeated misapplication. With this fact in mind, the visual "batch-and-hold" inspection procedure utilized before Alm's injury was a reasonable and safe procedure. The principle of the "batch-and-hold" procedure is that every cap misapplication which can cause a blow-off is very apparent *and* is always the result of a misadjustment in the machine which has been subsequently repeated. Consequently, such a misapplication will appear in a number of bottles and can be traced back to a specific problem with the capping machine. If *properly followed*, the "batch-and-hold" procedure should always be effective in catching misapplied caps with blow-off potential.

Alm's expert, Mr. George Green, and J.F.W. plant superintendent, Ferro, both testified, however, that bottle caps which are the product of intermittent misapplications can also have blow-off potential *and* can easily go undetected in a "batch-and-hold" inspection procedure. Such intermittent misapplications are not the result of machine misadjustments but, according to Ferro, can result in improperly formed threads. Yet, Ferro affirmed that J.F.W. was operating on a close budget in 1975 and 1976, and as a result he was unable to have the additional line personnel he had wanted. It is clear that the "batch-and-hold" procedure had to be properly followed and that this was something over which J.F.W. had control. Notably, Green admitted he did not know whether the Alm cap was the product of repeated or intermittent misapplication failure. Furthermore, while Green testified that an engineer should and could have designed a fail-safe mechanical type inspection system, the evidence showed no such device exists or is in use today. Significantly, because of the financial pressures experienced in 1975 and 1976, J.F.W. went without additional equipment Ferro admitted he would have liked to have had, as well as a proper application tester. With this in mind we find it difficult to find the evidence factually sufficient that Alcoa was grossly negligent for not including as a part of its capping machine an automatic mechanical inspection device.

■ Next, we consider whether the evidence was factually sufficient to prove Al-

coa was grossly negligent by designing and offering a cap with a pilfer-proof band. The problem with the pilfer-proof band on the caps is caused by the propensity of the band to retain even an unthreaded cap until a consumer breaks the band, causing the cap to then blow off and potentially cause injury. Apparently, the slight force exerted by the pilfer-proof band will prevent a misapplied cap from blowing off in the bottling plant, or a similarly innocuous place. Alcoa argues they offered the pilfer-proof band only as an optional feature and they also offered caps without this feature. Many of the bottlers opted for the protected cap because of prior incidents of food tampering. Alcoa also offered evidence that the feature promoted cleanliness and helped in detecting spoilage.

Green opined, however, that the pilfer-proof band should not have been used and, he added, an average engineer would not have used one. Alcoa employee, Gibbs, testified the ring was responsible for holding the cap on in the Alm case by acting as an additional thread. Gibbs also admitted Alcoa had tested the pilfer-proof band in a situation with weak threads where it was essentially the ring part of the closure holding the cap on the bottle and preventing premature blow-off. We conclude from this that the pilfer-proof band did increase the likelihood of blow-offs involving personal injury, and that Alcoa was aware of this hazard. We hold, however, that the evidence greatly preponderates that Alcoa kept Seven–Up informed of this hazard.

Alcoa offered into evidence correspondence between Seven–Up, the parent soft drink company, and Alcoa, concerning slide show presentations, training seminars, etc., on proper application of the Alcoa beverage closure. Among the documents were inter-office memos from Alcoa. Alm objected to the admission of this evidence, arguing it was self serving and lacked relevancy. The court admitted the evidence, but on a limited basis, to the extent it related to the allegations of gross negligence and therefore, the conduct, care and effort expended by Alcoa before the date of Alm's injury. Among the documents admitted was a memo dated July 27, 1972, reflecting all

those in attendance for a slide show presentation put on by Alcoa. Importantly, a representative from Seven–Up was included on the list. The slide show was entitled "Proper Application of the Alcoa Beverage Closure" and initially showed a 28 M/M bottle topside *with a pilfer-proof cap.* Significantly, the aluminum cap dealt with in the slide presentation was a pilfer-proof cap, and in the first ten slides out of more than one hundred included in the presentation, there was a clear depiction of the explosive and potentially dangerous nature of bottle cap blow-offs. The danger was demonstrated by a cartoon portraying, on three successive slides, a consumer starting to open an aluminum twist off carbonated beverage and the cap unexpectedly flying off, breaking the glass of a nearby window. The terrific force required to propel a bottle cap through glass depicted the great potential for bottle cap blow-offs to cause personal injury.

In another memo transmitted within Alcoa, at least eight individuals with titles indicating policy and decision making positions within Seven–Up were recorded as having viewed the slide show. Subsequent memos indicated follow up efforts by Alcoa to keep Seven–Up informed of the potential hazard. The Supreme Court stated "[t]he issue in every case is whether the original manufacturer has a reasonable assurance that its warning will reach those endangered by the use of its product." 717 S.W.2d at 591. Alcoa and Alm appear to agree that the parent soft drink company, Seven–Up, controlled the graphics and art work on the bottles produced by J.F.W. and, therefore, neither Alcoa, J.F.W., or anyone else, other than Seven–Up, could control what appeared on the bottles. Here, Alm asserts that Alcoa did not, but could have, required anyone who operated under their patent, to put a warning on the product. We are not prepared to say an original designer-manufacturer is charged with a duty to require an appropriate intermediary to take specific action, particularly if the original designer-manufacturer has no reason to believe it necessary. The evidence of Alcoa's efforts to instruct and

warn Seven–Up revealed Alcoa was receiving positive feedback from Seven–Up which would indicate such "reasonable assurance," without Alcoa's resorting to contractual measures.

Importantly, the evidence on the issue of gross negligence was not well developed in light of the Supreme Court's new rule. Although the charge did not literally suggest that the trial court was instructing the jury that the only evidence relevant to the question of Alcoa's conscious indifference to Alm's welfare would be the evidence of warning by Alcoa directly to consumers, as Alcoa asserts, the trial did proceed in such a way that Alcoa could not have vitiated its liability without showing it had adequately warned Alm or at the very least J.F.W. Because exemplary damages are punitive in nature and imposed to set an example for others, *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549 (Tex.1985), we feel it would be manifestly unjust to find the evidence factually sufficient to uphold them here.

The evidence Alcoa produced of its warning to Seven–Up indicated Seven–Up was adequately trained (i.e. the slide show) and warned about as well as familiar with, the propensities of the product and capable of passing on a warning. Alcoa's conduct in warning and instructing Seven–Up effectively negates both the objective and subjective tests in *Williams v. Steve's Industries, Inc.*, 699 S.W.2d 570 (Tex.1985). *Williams* provides that a plaintiff may prove a defendant's gross negligence by proving the defendant had actual subjective knowledge that his conduct created an extreme degree of risk. A plaintiff may also prove a defendant's gross negligence objectively, by proving that under the surrounding circumstances a reasonable person would have realized his conduct created an *extreme* degree of risk to the safety of others. *Id.* at 573. Importantly, the term "conscious indifference" used in the definition of gross negligence underscores the apparent decision, despite *extreme* risks to another party, of the defendant's lack of care about the consequences of the act which may ultimately lead to that harm. 699 S.W.2d at 573, [emphasis ours]. The

evidence of conscious indifference was not factually sufficient here.

■ Alm argues that given the facts in general, with Alcoa's inadequate warning to J.F.W. and complete absence of warning to the consuming public, this court must find sufficient evidence to support punitive damages against Alcoa. We do not agree. All of the evidence of Alcoa's knowledge and failure to warn the public is not conclusive as to the issue of gross negligence. Overturf's responses, indicating his equivocal attitude about warning the public of the potential dangers associated with blow-offs, which are heavily cited by Alm, cease to demonstrate the conscious indifference elementary to gross negligence when it is shown that Alcoa was making an effort to deal with and extinguish the problem by alerting Seven–Up. The evidence showed that officials of Seven–Up and other bottling companies viewed the slide show, which began with an explicit warning of the hazard involved and continued with a technical pinpointing of the problem. We realize the issue is raised concerning adequacy of a warning, and that this is a fact question which we may not decide. Of course, this court is not precluded from finding the evidence factually insufficient to support the jury finding of punitive damages based on that warning. Since punitive damages is the only issue we cannot sustain following our review, made pursuant to the Supreme Court Mandate, we hereby remand to the trial court on the issue of gross negligence only. *Olin Corp. v. Dyson*, 678 S.W.2d 650 (Tex.App.—Houston [14th Dist.] 1984, rev'd on other grds.)

■ TEX.R.APP.P. 81 allows this court to order a new trial exclusively on issues affected by error in a case "if it appears that the error *affects a part only* of the matter in controversy and that such part is *clearly separable* without unfairness to the parties," [emphasis added]. *See Harder v. Sanders*, 155 Tex. 149, 284 S.W.2d 144 (1955); *Blackmon v. Nelson*, 534 S.W.2d 439 (Tex.Civ.App.—Texarkana 1976, no writ). Here, it is instructive to refer to the recently enacted provision in the Texas Civ-

il Practice and Remedies Code on exemplary damages. In codifying past case law, the code states that exemplary damages may be awarded only if the claimant proves fraud, malice, or gross negligence. Tex. Civ.Prac. & Rem.Code Ann. § 41.003(a) (Vernon Supp.1988). Furthermore, the statute provides that the burden of proof for exemplary damages may not be satisfied by evidence of ordinary negligence § 41.003(b). This is, in fact, only logical as compensatory and exemplary damages are treated and characterized as completely different legal forms of relief. While the purpose behind exemplary or punitive damages is not only to punish the wrong doer but also to make an example of him, *Hofer v. Lavender*, 679 S.W.2d 470 (Tex.1984), the purpose behind compensatory or actual damages is simply to make the claimant whole. Consequently, when the jury considers the evidence for punitive damages, their focus is on the defendant and his behavior, whereas for compensatory damages the jury's focus must be on the claimant. Such is the nature of punitive damages, in relation to compensatory, that there is no need for a precise ratio between the two. *Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908 (Tex.1981).

Consistent with this reasoning is a discussion from a recent case out of our sister court, addressing the trial court's error in submitting a comparative fault issue and attempting to use it to reduce the appellant's gross negligence issue. The court opined:

> "gross negligence" inquires about intent, i.e., "conscious indifference," while ordinary "negligence" inquires about "ordinary care," regardless of intent. Because "negligence" and "gross negligence" are different theories on which a recovery may be obtained, and because a recovery under either theory depends on separate and distinct elements of proof, the two are not comparable. *Otis Elevator Co. v. Joseph*, 749 S.W.2d 920 (Tex. App.—Houston [1st Dist.] n.w.h.).

We affirm the judgment on ordinary negligence and reverse and remand on the reinstated issue of punitive damages.

SEARS, Justice, concurring and dissenting.

I concur with the majority opinion in remanding the gross negligence issue for a new trial; however, I dissent from the affirmance of the negligence findings based on a failure to warn JFW, and dissent from the majority finding that the evidence was legally sufficient to support the jury's finding of gross negligence.

I believe our review on remand should include whether Alcoa satisfied its duty to warn Alm by adequately warning *Seven–Up*. The supreme court's remand directs this court: "... to consider Alcoa's factual insufficiency points regarding the adequacy of its warning of the hazard of cap blow off to *JFW*...." *Alm v. Aluminum Co. of America*, 717 S.W.2d 588, 595 (Tex. 1986). (Emphasis added.)

The supreme court concluded Alcoa had a duty to adequately warn the consumer, but held that duty could be discharged by adequately warning "the intermediary." *Alm v. Aluminum Co. of America*, 717 S.W.2d at 595. However, Seven–Up is the only intermediary with the authority and the means to include a warning on the bottle or the bottle cap. I do not believe the Supreme Court intentionally limited our review to the warnings Alcoa gave JFW.

Pursuant to the franchise agreement between Seven–Up and JFW, only Seven–Up had control of package shapes, components, labels, graphics and contents. Alm argued that Seven–Up controlled warning labels, and Alm vigorously argued to this court that Alcoa could not satisfy its duty to warn Alm by warning JFW, *because Alcoa had a duty to warn Seven–Up.* Yet, when Alcoa presented evidence of its warnings to Seven–Up, Alm objected to the testimony and the evidence on the ground that it was irrelevant and self-serving. That evidence included a graphic 35mm slide presentation showing the danger inherent in cap blow-off. The evidence further indicated that Alcoa showed the slide presentation to Seven–Up personnel in Texas and in many other states. The presentation was made to the Seven–Up Vice–Presi-

dent of Quality Control, Manager of Field Technical Services, Manager of Package Engineering, Manager of Contract Bottling and Canning, Midwestern Technical Manager, Eastern Technical Manager, South Central Technical Manager, Western Technical Manager, Quality Control Manager and others. The slide presentation was also shown to Pepsi–Cola, R.C. Cola, Anhauser–Busch, Contract Beverage Packagers, Inc. and others. The evidence showed that presentations were also arranged for Vess Beverages, Dad's Root Beer and Coca–Cola. Alcoa presented evidence of many office memos to bottlers warning of the hazards of the improper application of closures, improper adjustment of bottling machines and safety in general. Letters from Seven–Up personnel thanking Alcoa for the presentation and for enlightening Seven–Up, as well as letters from Alcoa requesting permission to show the slide presentation to other Seven–Up bottlers, were admitted into evidence.

Alcoa does not own the bottles, the caps or their contents. Alcoa has no means by which it can adequately warn a consumer of the hazards of a misapplied bottle cap. Therefore, it prepared a slide presentation depicting the danger and showed it to the intermediary, Seven–Up, who alone possessed the means by which this warning could be passed on to a potential consumer.

Because Alm objected to the evidence of Alcoa's warnings to Seven–Up, and because Alm succeeded in limiting the jury's application of such evidence to the facts of this case, the jury was denied the opportunity to determine if Alcoa's warnings to Seven–Up were adequate to discharge its duty to warn Alm. Therefore, I would also remand the issue of ordinary negligence to the trial court for a new trial consistent with the new rule fashioned by the Supreme Court. *Alm v. Aluminum Co. of America,* 717 S.W.2d 588, 592 (Tex.1986).